I hope we haven't completely messed up your summer. Not at all. I'm honored to be with the Court today. Nice to see you again, Ms. Rich. Sorry it worked out this way. Let everyone stay safe and dry. May it please the Court. The District Court erred by misapplying a very narrow exception to the 14th Amendment's one-person, one-vote requirement for electoral districts. And that decision, if left standing, threatens to muddy the proverbial waters in this important area of law and undermine the ability of Texans to have a fair say in how their property is regulated and governed. So the Supreme Court has not addressed popular election districts in this context. Is that right? The two cases where the exception has developed, Sawyer and Ball, were not popular election cases. Some of the other circuits have. Is that also right? That's true, although the vast majority of them were not open franchise cases. States do, of course, have the ability to create so-called special purpose districts, a kind of local government with specialized focus and powers. And the United States Supreme Court has said in a very narrow set of circumstances, some of those special purpose districts may be exempt from compliance with having equally populated districts. But the Edwards-Aquifor Authority, or the EAA, does not come close to qualifying for that very narrow constitutional exception. For that exception to apply under the Sawyer and Ball Supreme Court precedence, three factors must be satisfied. One is a threshold one that Judge Smith just brought up, and then the two conditions analyzed in Sawyer and Ball. And the first, of course, is that the franchise be limited. If the franchise is open to everyone, then the jurisdiction is required to comply with one person, one vote. And all three conditions must be met. Then if it's a limited franchise case, the courts would then look to the two Sawyer and Ball conditions. Where do you say the clear statement is that an open franchise case is off the charts, off the board, in this sort of argument? I think it starts in Hadley, where the court says there's just no way, when the jurisdiction has granted the vote to everyone, there's no way to really draw a line. And then in Sawyer and Ball, the court says, the reason we're looking to figure out whether this is one of those narrow exceptions is because this isn't an open franchise case. Let me say that I've looked at the case, Paul, you pointed out in your brief, and as errant as I may be, I don't see the clarity that you're talking about in those statements. So if, in fact, the Supreme Court has not closed the door to that, isn't the opposite actually true from your argument? That an open franchise makes the kind of weighted voting that is permitted under Sawyer and Ball less objectionable? That at least everyone has some role to play? Well, if there is an open franchise, I think it sort of cuts against the second issue that a court looks at to see if an exception to the one person, one vote exists, which is that the jurisdiction has a very narrow purpose and function and role and relationship to the people afforded the electorate. So for example, if everyone votes and everyone participates, it seems like a governmental entity that has much broader effect and authority. Whereas if you're just talking about dentists, or if you're just talking about lawyers... Well, it's one thing to say what sort of the sense of it may be, but looking at what the EAA, actually, their authority is, it's certainly a limited purpose in so far as just dealing with the water and the aquifer and aspects of that that you know better than I do. And they don't have the kind of broader powers that Sawyer and Ball is talking about. So it's one thing to say what your expectations may be when it's an open franchise, but this authority seems to me, you'll say it has too much power, and that's something we'll have to consider. But it's certainly a limited power over a limited aspect of the governmental functions in that those three groupings of count. And that was the case in Hadley as well. The Supreme Court said the powers that the junior college trustees exercise in Hadley are less than in Avery, for example, with the Commissioner's Court, and the scope is less. And there's still, because of an open franchise and because of the kinds of powers that the trustees exercised in Hadley, there was still a requirement that once the vote was afforded to the entire electorate, that the rules of one person, one vote must be complied with. But it's also significant. Let me pick you up on that, if I might. What do you say to the suggestion that there is a basic distinction between disenfranchisement and dilution? And that we take a limited purpose creature, if you will, it doesn't possess the general powers of a state. But then opens it up to voters or general character, albeit in a situation where their vote carries less weight. There's a real distinction, to my mind, in that circumstance. Why isn't that, why, you argue that even if, in this limited situation, whether there's just voter dilution, that it nonetheless is condemned as it reaches beyond a single-purpose organization. Your Honor, in Reynolds v. Sims, the Supreme Court recognized that the dilution of a voter's voting strength could be just as violative of the 14th Amendment as total disenfranchisement. Of course, but what we're talking about here is a situation where you're talking about a single, where you have an instrument that does not exercise the general powers of government, which is the case in Reynolds. It's a straightforward application. Here you have a situation where the state creates an entity, but does not give that entity the indicia of state power, taxes, et cetera. It would start with that universe, we have that type of a creature. But then that creature, which would be a single-purpose if they didn't limit it, for sure, if they didn't open it up to the large population and so forth. But let's say they did go ahead and open it up to a large number, but it's a weighted vote. We can look at the Salt River Project, for example. It seems to me that there's a real distinction there, because they are permitting single-purposes to give weight to certain votes. The Chicago case in which they're dealing with the councils, so if you remember the various councils of the schools, how they structured that, which was a dilution case. Yes, Your Honor. So what I would suggest here is this goes to the second prong of the test under Salyer and Ball. So the question doesn't just end with, does the special-purpose district have general governmental powers or not? It also, you have to show, it has to be shown that the exercise of the authority and powers of the jurisdiction, whatever they be, act both to the benefit and burden of a discrete, definable group. So for example, in the Salt River District, they did have weighted votes. It was weighted by how much the landowners, how much acreage they had. And they were only making assessments against... They also supplied a higher percentage of electrical power to Phoenix too. Right. And that was a business enterprise incidental to the purpose of the district, which was water conservation. Here, the purpose of the EAA is much broader. I mean, this is not just about compliance with the Endangered Species Act. The authority has greater powers to ensure that water is not wasted, that public health interests are served for all of the people who use the Aquifers water for various reasons. But to get to your point, the weighting isn't a problem. The weighting of votes, when there's a limited franchise and the votes are weighted based on something other than population, it's not a problem specifically because those individuals in that narrow group, and even the ones who have a greater weight to their vote, are the ones bearing the benefits and the burdens of the scheme's operation. What are the burdens that the Bexar County residents are carrying here? So the most significant one is that Bexar County residents bear the cost of 75% of the EAA's operation, even though they have, by far, the least powerful votes in saying how it's governed. And explain that to me. What do you mean by they bear the burden of 75%? Because of the cap on the rate for agricultural usages for the Aquifer management fees, users who are using it for municipal or industrial purposes pay a much higher rate. And so because that's what Bexar County is using the water for, mostly non-agricultural purposes, they're paying millions and millions and millions of dollars every year to use that water. And so they're funding the operation of the EAA, even though they don't have 75% a controlling voice in what the EAA decides to regulate. Then there's also the burden of- But before you leave that, counsel, there is an intermediary between the Bexar County residents and EAA, which actually is the one that pays the charges to the EAA. Help us with that. Why doesn't that take away the problem that you're talking about? For several reasons. The first is that the EAA can dictate how some of the costs are passed on and the burdens are passed on to the consumers, SAWS consumers, the users of water. They can regulate how Aquifer waters can't be used on golf courses and utility rates at certain times and make those usage conditions a permit. Without you saying all these words about me. So that's one. The other is just the undisputed testimony from the SAWS president about the ways in which the SAWS really has no wiggle room when it comes to complying with what the EAA mandates with respect to behavior and conduct of the consumers within Bexar County. And there's the burden. So there's the financial burden, but there is also the burden of having your conduct governed, having the EAA tell you how you use your private property, both the water that you own under your land and what you do on the dirt above that. This is a really significant power that I think has been perhaps lost in some of the cost discussions. It is a real burden that the EAA's exercise of its authority imposes on Bexar County residents. They can be forced to pay fines for not capping old abandoned wells. They can be told what kind of paving can happen, and the EAA has not. Basically, you're describing the gifts of the Aquifer to San Antonio as a burden because in producing all that water for all these residents of Bexar County, they have the audacity to have some regulations about how it's used. When all users out of that Aquifer are restricted and used and regulated, that's because that's the community of interest. I have a hard time describing that as a burden put on the good residents of San Antonio. It looks to me like it's a gift of the good Lord to create that Aquifer. And I certainly wouldn't dispute that the voters in Bexar County also benefit from the EAA, but the question is, are the people who are seeking a fair vote— Look at the map of the Aquifer as it comes through Caldwell. It swings up and around. Bexar County is just up in the north. It just trips through the northern part of Bexar County. And Bexar County is—turn it back around the other way— Bexar County is drawing an awful lot out of there to the detriment of the agricultural unit up there. I mean, you can look at it in different ways. But I just have a difficulty with seeing that somehow or another the presence of the consumers of the water are burdened by their— They're attaching so much consequence to the fact that you regulate the usage of water— of users in San Antonio when you regulate all users of water, and that's a built-in inherent necessity. And precisely. I mean, when you have a common resource like this, sometimes someone's abuse or use is going to affect another group's. But for the Solyer Ball exception to apply, there has to be an identifiable, discrete group that is disproportionately impacted, bears both the burden and benefit. Here we have a situation where everyone reaps some benefits and bears some burdens for the ability to access the aquifer and to make sure that it's usable in the future. So it's just not possible to say, here is a group—the agricultural voters, for example— that are so disparately affected by the administration of the EAA that they should be afforded more vote. It's not—this isn't a category where you can say, these are the only people being taxed or these are the only people getting water dispersed to them. That was the case in Solyer and Ball. So I think the easiest way to decide this case is obviously the open franchise versus limited franchise case. What is the say-so of a resident of San Antonio? What say-so does the resident of San Antonio use of the water have? There is some participation. What is it? They have—there are seven seats that are elected from Bexar County and eight seats from outside of Bexar County. So it's not a disenfranchisement. It's a dilution. It is a dilution, yes. So we're back to this question of disenfranchisement versus dilution. I take it you would disagree with Judge Posner's decision in Pittman, which is—the city council, which he plainly says that these lines are drawn at very difficult and single purpose. However, there's a fundamental distinction between disenfranchisement and dilution. And so, in other words, you talk about the people of San Antonio, the voters of San Antonio are being deprived of the opportunity. It's not that they're not deprived of the opportunity. Their votes are—they don't have as much power to their individual votes. Dilution. That's what we're talking about. And the question is essential. Throughout these single purpose cases, that's always the case. You have parents without kids, et cetera, et cetera. And that—so what do you do with this decision? Should we not follow his reasoning? I think the facts in that—in Pittman are different enough to create— and the recognition of a need of this court and to correct an error in the court below to ensure that the way that the judiciary is dealing with this very limited resource, groundwater, is consistent with Texas law and Texas jurisprudence. So remember, too, that in—the Texas Supreme Court has recognized the importance of groundwater. The problems associated with maintaining and conserving the aquifers, exceptional and unique groundwater, as one that needs—is a problem that needs to be dealt with by everyone, not foisted on a few. Would you have made that argument for Phoenix? The argument sounds very much like the argument that the city of Phoenix went back and they lost. And I think that the major differences between Ball in this case are that in Ball, the district had no ability to control the usage of the water that it was dispersing to landowners. And that's not the case here. But even more significantly, the sale of electricity to the people of Phoenix was just incidental. I mean, so there were landowners who had votes in Phoenix, but the bigger issue was the providing and the sale of electricity. But that was a business enterprise, incidental to the purpose of the Salt River District, which was to conserve and disperse water, surface water. And here we have a common resource groundwater issue that we want to make sure that the property rights of Texans to access the groundwater that they own beneath their property and how they conduct their behavior on top of the groundwater on the land that they own is that they're allowed a say in the policies and the administration and the policing activities of the entity that's going to affect those rights. Council, of course, they do have a say. It's just not as much say as the other components of it. Let me ask how your argument is affected by my understanding of the statute and you can start with straightening out my understanding of the statute. But it does look to historical usage of the water and the permits are at least initially based on what that historical usage was. And we're looking at the case law that's relevant here and where the disproportionate impact of whatever the entity is may fall. Does that historical usage have some role to play here in deciding whether, in fact, the adjacent groupings of counties do have a disproportionate benefit and burden of the Edwards Aquifer? I think the historical usage piece is an element to consider when you're looking at the breadth of the power of the EAA. So by being at least initially limited by historical purposes, the EAA has some guidance on how much water might be allowed to be pumped by the agricultural folks versus the urban areas. But the EAA exercises power and has power to deviate from that, to change the purpose of use permitting. So these property rights are so significant and valuable that permit owners or landowners are severing the water rights, the groundwater rights, and selling them. And the EAA is looking at purpose of use amendments. So it's not static. Amendments of what? To go back to the legislature to get the statute amended? Or what do you mean? No, no, no. If someone out in the agricultural area whose historical usage was related to pumping for irrigation for agricultural crops wants to sell its water rights to someone who will use it for industrial purposes, they can do that if the EAA approves the amendment, the change to the permit. And so this is yet another way in which the EAA can control the conduct. And if you go back to Ball, that is what the Supreme Court said was the constitutionally relevant fact in Ball, was that the district there could not control the conduct or how people used the water after it was dispersed to them. Under the EAA's permitting scheme, that's not the case here. There's quite a bit of control. Then what they could simply turn around and do is just restrict the amount of water you get. And that would keep you from running the sprinkler all day or whatever. I mean, the distinction that escapes me in reality, the very essence of the single purpose and the whole reason for the necessary existence of this agency, the Aquifer Agency, is to preserve as a natural resource. And now what happens if the voters, because they don't like to be told how much water they can use, they vote simply to do what? To drain the aquifer? I mean, what's your control then? The EAA Act still limits the, I mean, that's a, it was a parade of horribles that was discussed when the Act was initially formed. It was, oh, if we give San Antonio voters their fair say, they'll drain the aquifer. But the statute itself limits the- The question is one of impact or not. And that's true in disenfranchisement. Was there an impact or not on this particular segment? And I would suggest to you that that same distinction ought to extend to the, from disenfranchisement to dilution. In other words, the question of whether or not you can dilute the votes of the Bexar County residents turns up on the impact. And that, because it's almost not fortiori, but because it isn't disenfranchisable entirely without that. Well, if that's true, then you're dealing with a diluted vote. That's all you have. I guess that's a, what is the impact? And the impact that you described to me is the loss of power to control how much water you can use. Not how much, but how you use it. Some say in the policing authority, the rulemaking authority. There is a limit. The statute limits the amount of water. But the policy preferences and rules enacted to enforce different usage requirements is something that San Antonio residents should have a say in. The way- Is this a fight then between the city industrialists, so to speak? I don't see San Antonio as an industrial empire. But the city folk and the business folk versus the farm interests? I don't think so. And even if it were, that's not- I mean, the people who use the aquifer's water to drink have just as much an interest in conserving the access to it and the quality of it. I mean, I know LULAC pretty well. Through the years of your good work in voting cases. And you're representing the voters. Here, the only impact that you really articulate, though, really is business impact and industrial impact. No. I mean, in our briefing, we talk about the fact that EA inspectors are assessing fines for unfortunate folks who may have an old abandoned well on their property in San Antonio. These are daily life impacts that make it such that the second Sawyer Ball precondition, a real definable disparate impact, can't be satisfied. So it isn't just how much San Antonio residents are paying for their drinking water. It's how the health and safety inspections, the compliance processes are run. And if the EAA is going to have that kind of impact on San Antonio voters' daily lives, then San Antonio voters ought to be able to have a say in it. And remember, too, it's voters- What kind of say do they have today? One that is not proportionate to their population. Not a controlling- I understand. But you make a disenfranchisement argument. And the voters here are not disenfranchised. That's a fact. Their vote is diluted. Diluted. Let's be clear about that. Yes. And so you've got a lot of voters. And so that adds up to a lot of voting power. I see a real fundamental distinction between enfranchisement and illusion. And I'm impressing you on that because it may be that it doesn't hold. But that's what I see in these cases. And I'd be happy to further address that in light of- All right. Thank you. I appreciate your argument. Thank you, Your Honor. Thank you, Ms. Riggs. You've saved time for rebuttal. Ms. Traill. Good afternoon. May it please the Court. My name is Deborah Traill and I represent the Edwards Aquifer Authority. This case squarely falls within the Sawyer and Ball exception. The EAA is a special purpose district with a very narrow purpose to protect the Edwards Aquifer. And the EAA's activities disproportionately impact those voters most empowered by the EAA's voting scheme. Well, you kind of overstate your case when you say it squarely falls because neither of those cases had to do with the general franchise. Your Honor, I'd like to talk about how those cases set up the situation we have and provide the possibility for what the Texas legislature did in this case. First, to be clear, appellants seek to create a new rule that wherever the vote is given to everyone living within an area, all votes must be weighted differently. But that is not the law and there's no case that they cite that provides that rule and it's contradicted by numerous cases. Including in the Supreme Court, in Avery, the Supreme Court reserved the question of whether a special purpose unit of government affecting definable groups of constituents more than other constituents could be apportioned in ways which give greater influence to the citizens most affected by the organization's functions. Suggesting that legislatures may give a weighted vote, but not necessarily the only vote to those most impacted. And in both Sawyer and Ball, the court approved district voting schemes that gave only landowners the vote, but weighted landowner votes differently depending on how much land they own. In Sawyer, the court noted that it may have been preferable for the court, for non-landowner lessees to have been included in the district's voting scheme as well, since they were also impacted by the district's activities. But the court would defer to the approach chosen by the state legislature, as the question for the court, when looking at that very special purpose district with a very narrow purpose, was whether the state had a rational basis in devising the electoral scheme, not what the reviewing court would have done. In town of Lockport, the Supreme Court approved a voting scheme for a referendum in which all residents of the county could vote, but the votes were weighted differently depending on the geography of the residents. Demonstrating that there is no absolute rule, that where the voting franchise is given to all within an area, the votes can't be weighted. And then in the circuit court- Let's stay with Lockport for just a moment. You have fairly characterized it, but doesn't it mean one of the characteristics, distinctions that you've acknowledged is that it's a single shot referendum, not continuing governance of something affecting, makes Lockport a pretty weak support for what we need to do in this case. Am I understating it? No, I think you don't stop with Lockport. But what you see in Salyer and Ball is we've got a Supreme Court that says, the state legislatures are going to need to devise schemes to address local conditions in different circumstances. And we've got to be somewhat flexible in the way that we let state legislatures act. So I think you then look at cases where this issue was clearly before the court, and those are Kessler and Cantwell in the circuit courts, where in the Second Circuit, Kessler, the voting scheme was given to everyone living within an area. The court found the district was a special purpose district with limited powers and reviewed whether the effect on property owners was disproportionately greater than on other voters. Not whether property owners were the only parties affected or whether property owners' entire economic well-being depended on the district. But Lockport was a single-shot referendum. Right, sure. But in Kessler, that's right. So as I was saying to Justice Southwick, we can't stop there. What it tells us is the Supreme Court recognizes that state legislatures may need to adopt different approaches to address localized conditions. But we can't stop with those two cases because the situation was not directly in front of them. But in Kessler and Cantwell, we do have very analogous situations where the franchise was granted to all residents living within an area, but the vote was differently weighted. In Cantwell, the court found that the district was a special purpose district, but said the question before the court was whether Indiana, having elected to give some added voice to citizens particularly affected by particular governmental functions, must give them autonomy or the sole vote with respect to those functions. But the court found that it was fair for the legislature to give some vote to those citizens who were less impacted as well, as the legislature in Texas did with the EAA, because they had some interest in participating in the election of representatives involved in the district's affairs. The court said the allocation of the voting franchise is not susceptible of precise mathematical solution. It was a reasonable accommodation of the various interests involved. The policy underlying the Sawyer Ball exception also contradicts the argument that states can never weight the vote differently when all people living within an area are given the vote. LULAC's argument would operate as a straitjacket to prevent states from addressing local problems with some flexibility and would deny any vote to people who are somewhat affected by the activities of a special purpose district. Well, Counselor, I can agree with that. It does seem to me as I was talking with your friend on the other side that the general franchise to me doesn't make the situation less fair. It may indeed make it more fair, but the problem is it undermines the idea that this is special use enough with a weighted constituency out there or with a constituency out there that's more affected since you're giving the vote to everybody. One of the arguments that I think has some, at least at the beginning, of interest to me from the other side is talking about the authority of your agency to change the use of the water. Would you explore that? Absolutely. The assertions made by opposing Counselor are incorrect in their entirety about the EAA's ability to control the use of water. They're just simply not true. First, I must point out that groundwater in Texas is a property right. It is not something that a special purpose district or even the state of Texas can heavily regulate because it is owned by the property owners. And property owners determine how they're going to use their water. What she is referring to is actually about the property right of landowners to say, I was doing this one thing and now I'm going to go do something else. What the EAA does with transfer applications is ministerially review them. We're looking at, do you own this? Okay, name switched. What are you switching it to? Yep, that's not wasteful. Sure. It is not for the EAA to... You said that too quickly for me, but I think I heard the word waste. So that is something that the authority can decide that somebody wants to go from whether it's a San Antonio resident or a private home or a larger acreage and some industrial use. They are looking at some sort of parameters in making the decision and can say, no, you can't do that. Okay, so... Raised an important point of Texas law. So let me address this from the Texas law point of view. When we talk about waste in Texas, what we're really talking about in their Texas Supreme Court cases that look at what is waste and for instance, running a canal from Corpus Christi way inland and losing more than 50% of the amount of water in the canal due to evaporation, not waste. In Texas, as long as you're not dumping it out and not using it, it's not waste. So no, there is no... We would be sued for taking. If we were to tell a landowner, no, we don't think that's conservative enough. Really, it's... You're saying they can't say no? Not really. I mean, in other words, a property... Is there litigation over this? Has your authority been involved in litigation? We don't say no. If you say you want to switch from one use to another, we do not have the ability to tell you as a property owner that you can't do some other use with your property. What role does the authority have? In revenue and transfers, it's ministerial. Once the property right is granted, once you've got a permit, and you talked about historical use. So once historical users came in, if they want to change their... They get a permit and they may change that use from one use to another. Now, part of what the EAA does in regulating the aquifer and protecting it is there are some drought cutbacks that limit the use of water when the aquifer starts to fall. And those are mandated by the legislature. They're in the EAA Act. And there are also general conservation requirements. And so that's some of what has been touched on earlier, that there's an obligation to conserve water. So, for instance, a lot of irrigators have switched to more conservative pivot practices, not because they were mandated, but because they chose to do so. How does historical usage apply to the residents of San Antonio? They have historically used water. Or the water authority, whichever it is, that actually pays the money to the EAA. Who has the permit? The San Antonio water system. Okay. So it's one big permit for all the residents of San Antonio. Correct. And it's the San Antonio water system that pays fees to the EAA. There are no fees paid by residents of San Antonio. In San Antonio, 100 acres, that needs a fair amount of water for some reason. They don't have an individual permit historically? They might. So it would just be a question if you were a well owner. So if you were a well owner when the EAA Act was passed, and remember, there was a lot of litigation that led to the creation of the EAA because there was a desperately needed solution to the problem of the aquifer being drawn down. There were industrial users in the San Antonio area that had permits because they had wells and were pumping at the time the Act was passed. So there are also folks who have wells. It's just that the total amount of permits in the entire San Antonio, Edwards Aquifer Authority region is less than 2,000. And so as to control, I think it's really important to understand that the EAA simply monitors permits and ensures that users use the amount in their permit, implements those sorts of cutbacks, and requires them to have conservation plans to use their water as efficiently as possible. It's important also to realize that Bexar County residents are not impacted by fees other than as a flow through. And that is because the city of San Antonio is using Edwards Aquifer as one of its sources of water, and a large source of water. But it's not its only source. And San Antonio has publicly announced that it intends to reduce its dependence on the Edwards Aquifer. What if Bexar County could only elect one? Would that make a difference? One representative to the board? I think that it's important that the legislature was trying to balance the interests, and that it recognized that the use of the water was across the region, and that it was important to San Antonio. It was San Antonio legislators helped to pass the EAA exactly as it's written, including with this balance. The testimony in the record of their then state representative, Robert Puente, that there were three competing interests, one in the water, the agricultural community, the urban community, and the springs community. And whatever governing body was going to oversee this couldn't be dominated by one of the three. And so if you divided it up into thirds, two of the three would have to agree on a particular issue for that issue to prevail. I don't think that it's even possible that that would have been acceptable to the region for then the spring flow and agricultural to have sole control. The whole idea was to look at the use of the water, look at the importance of the water to these regional interests, and to try to provide a balance. Well, going back to the issue of impact versus dilution, it is the Texas state legislature in which the residents of Bexar County are represented by one man, one vote, one person, one vote. It creates the allocation among the competing users of multiple counties within the state and their users itself. So what's the relevance of the fact that the voters here, that they have a dilution of immediate votes in this particular entity that's created, but that they had a full measure of votes in representation of the body that created it? The courts don't talk too much about that because it's a limitation upon the legislature to create a body that has governmental powers. But the argument that you're making is the governmental powers here is simply the allocation of resources that under state law. I don't know if you follow what I'm trying to talk. I think you've raised a couple of issues. One is about how does that play out, the fact that, A, that everyone has one person, one vote with respect to state legislature and the state legislatures who created this board. And that's true. And I think the courts have discussed that issue as that's sort of a fallback when you're looking at rational basis. In a different way, maybe it'll not get closer to it. What could the legislature have done or not with regard to this resource for which there are competing counties within the state and interests within the state of users? You've got a large agricultural interest out there, et cetera, et cetera. And those interests vary as you move across left to right because you validate those other counties. The voters were fully represented in Bexar County along with the others when the legislature balanced interest. Now, looking at the disenfranchisement, these cases that everyone has before them, the sequence of these cases, why isn't it enough that there is no disenfranchisement at all? It is simply an allocation of resources. It's an allocation of trying to balance those particular uses. And so behind that is somebody's decision that these agricultural interests are over here and whatever. Somebody's got to make that call, right? I think it's important that there's the ability of the legislature to craft this and that the legislature gave some vote to the interests of people in San Antonio as well as to those agricultural interests. I think within the EAA, we see these three distinct interests. Well, let me say that the legislature itself could have directly, without creating an agency, made allocations and they would have taken off every year and look at it again. But what they did is allocate it and let them go forward with it. So the actual balancing decision here was made with the decisions made by the voters of Bexar County as well. That's correct. So once you have that balancing decision made, then the question of what the agency is doing is simply administering that balancing formula, I take it. I think that's absolutely right. Once we are looking at a special purpose district, we know that the powers are limited of the agency. And there are disproportionate impacts. And if I may, I'd go through and talk about why we believe that the legislature appropriately determined the weights here. But once we know we're looking at a special purpose district, it's simply a determination of what's a reasonable allocation of the vote. In fact, the powers are so narrowly subscribed here. Everything the EA does is simply to protect this one of six aquifers within its jurisdiction. It's what powers related to quality and quantity are strictly about that limited thing. And it isn't something that impacts the daily lives of citizens. It's a very narrow purpose district. So I think the legislature worked very long and hard to find a solution. And that solution has worked for 23 years at balancing these interests. To talk a little bit about the disproportionate impacts, we know that aquifer use is much greater in the agricultural counties. In fact, the uncontroverted expert testimony of Dr. McCall is that western counties use three to eight times more water per capita than Bexar County. And eastern users use more than twice as much water per capita as Bexar County because they're using it for irrigation use in the west and in the east for irrigation use and aquifer-dependent recreational tourism and endangered species. I read that in your brief, and it's obviously talked about a fair amount. I'll make sure I understand that. There are fewer per capitas in those adjacent groupings of county. Does that mean that the overall use of San Antonio by volume, not by per person, is a whole lot greater than in the other seven counties? Well, when the act was being created, and that quote from Representative Prente is indicative of the testimony before the legislature was that roughly the use was a third, a third, a third. So per capita, that's much, much, much, much less in San Antonio. I was trying to leave you per capita behind and make sure I understand the overall water. So overall, at the time the legislature was considering testimony from the state, the one-third of the aquifer being used roughly in San Antonio and one-third of the aquifer being used in the western counties and one-third in the eastern counties, if that's helpful. We'll see. Thank you. In addition, you know, there are a lot of other – the President also talked about benefits and burdens of Edwards' regulation. And of course, those primarily fall on permit holders. The 2,000 folks that are keeping their water use below the amount of their permitted amount, that's a benefit and disproportionate benefit and burden to those people that most depend on water from the aquifer because when pumping is reduced based on, let's say, drought conditions, then they're the most impacted, and when they're allowed to pump, then they're the most benefited. And as you pointed out, everyone who's using these resources is benefited by the resource being available to them. We also know that recharge – in the recharge zone where the aquifer enters – water enters the aquifer through the surface features such as cave streams and sinkholes, that 88 percent of the recharge zone is located in the western and eastern counties, and only 12 percent of the recharge zone is in Bexar County. So the activities of the EAA to protect the quality of water recharged to the aquifer disproportionately impact people in the western and eastern counties. And then the land itself – three-quarters of the aquifer is located in the western and eastern counties, and only 24 percent of the land over the aquifer is in Bexar County. So people in the western and eastern counties who reside over most of the aquifer are far more impacted by aquifer management than those in Bexar County. And so far as disproportionate impact, is the evidence there that the western and eastern counties don't really have alternatives to water? No, they have – they use surface water. But San Antonio does? All of them use alternative sources of water besides the Edwards. There's not really a distinction that San Antonio doesn't have to use aquifer water. None of the three groupings have to. All three use other sources in addition to the Edwards. Right. So no, San Antonio is not in a position where it doesn't get water from other sources. In fact, it's – over time, its amount of water from the aquifer has decreased – the percentage of water it gets from the Edwards. Is that helpful? We talked about the powers of the district. I just really want to be clear that there's not just about the amount of water that can be used, but the EAA does not contain – does not hold the general governmental powers that are described in Stolyar and Ball as being general governmental entity powers. The EAA doesn't enact any laws governing the conduct of citizens nor administer such normal functions of government as the maintenance of streets, operation of schools, sanitation, health, or welfare services. It does not have a broader purpose to protect public health and safety. Unlike cities and counties who help supply water, wastewater treatment services, the EAA doesn't own any water. It simply ensures that there's water in the aquifer and that that water is reasonably clean. We also look to whether an entity has taxing authority. The EAA has no taxing authority. And it has – the fees that it assesses is for a service it provides  The EAA has essentially the same purpose as the districts in Stolyar and Ball. And that's why I said that we really do squarely fall within those two cases, to conserve and deliver water. The way that the EAA describes that is to protect and conserve the quantity and quality of water in the aquifer so that it can be available for permit holders and spring flows. But the EAA has even less to do than the districts in Stolyar and Ball did, as they had to build the reservoirs and water distribution systems. The aquifer itself is the storage and delivery system of aquifer water to users. And like the districts in Stolyar and Ball, the EAA lacks the breadth of general governmental powers and far-reaching impacts of a general governmental entity. And all of its powers, related to quantity and quality, are limited to fulfill its statutory purpose to ensure that there's water in the aquifer for permit holders and springs. I'd just like to point out that it's important to recognize that this court's decision is going to have a significant impact across the state of Texas. Like other states, Texas has devised mechanisms of local government to address local needs and efficiently solve local problems in the area of water management by creating groundwater conservation districts to manage one or more aquifers within their area. And several GCDs have been created with elected boards that are not based on one person, one vote, but give disproportionate weight to the votes of people most impacted by district regulation. So the court needs to be aware that if you find the EAA is required to elect its board on a one-person, one-vote basis, you will potentially be overturning the electoral scheme of numerous groundwater districts across the state. – Counsel, your statement certainly is well made, but it raises, it seems to me, the opposite problem. If this is Texas, the Texas approach to an awful lot of local problems, then we need to be particularly careful not to let Texas go further than they should be under Salyer and Ball and the other case law. This becomes the route of choice, and the guidance is even more important, not the approval, but the, in a way, the channeling of that consistent with the case law. – I think it's absolutely important that we, that Texas be acting within the case law and creating, when it creates special purpose districts without providing one person, one vote, that those districts be very limited in their focus, and I think they've gone out of their way to do that in setting up the scheme in this case. The powers have been narrowly construed by courts of special districts, and the EAA, certainly, everything it does is related to protecting the Edwards Aquifer. – One more way. – Yes, sir. – The argument I hear you making is also, seems to me to be accenting the limited, relatively limited role of this particular agency. That is, that it simply, it doesn't own the water, it abides with the state property laws themselves, and it follows the allocations that have been set by the Texas legislature, et cetera, et cetera. And, say it another way, the question is, it is a limited purpose, but it also seems, strikes me as limited purpose and a very limited, in its policy choices itself, but they've already been dictated by the legislature itself. So, that, when we look at whether this is a special purpose in the context of one man, one vote, we're talking about the utilization of a limited resource, and an allocation, the allocation of which has been made by the state legislature, and that this is just an implementing body here itself. So, another way of asking that is, is if the voters of San Antonio would, what really is the range of their impact period? I mean, if they had a majority vote, whatever, what could you do against the, given the legislative scheme that's already been set up? – That's right, and whether or not, whatever. I don't know if that's right or wrong, but I'm really kind of drawing out to try to shift the focus to that structure. – I think the EA is, the EA Act very clearly sets forth very specific permitting scheme, and very much limits the EA's realm, and tells it how to do everything that it does with respect to most of the activities of the EAA. – No, my question is, specifically then, the impact of the decisions that are made by the aquifer agency itself, that it has to make, etc., should be the, what we look to in terms of asking the question of what the impact is upon the voters of the county. – That's right, and the legislature, the legislature's... – Whatever the answer to that is, is that the correct question? – I think so, and I think that the legislature's decision here to give some voice to the, even those individuals who were less impacted should be deferred to, because the scope and the powers of the agency are so constricted. – Even though they don't have parents, and they don't have children in the schools. – Right, right, because it's important to the region. There's some importance, and this was quite the solution to a long-time problem, and I think that raises the issue that the EAA provided a mechanism to secure water supplies for irrigators, municipalities, downstream entities, and endangered species dependent upon the aquifer. If the scheme were undone, the legislature would likely either create an appointed board, or would vest management of the aquifer in an unelected state agency, denying all residents any direct say in the management of the EAA. The EAA has been incredibly successful over its 23-year history in both conserving the aquifer and balancing the interests of the region. It is a model nationwide for how to successfully manage aquifers. The EAA asks that this court affirm the trial court's reasoned judgment and find that the EAA is a special-purpose district which disproportionately impacts those voters most empowered by its voting scheme, and that that voting scheme has a rational basis. – All right, thank you, Ms. Trejo. – Thank you. – Rebuttal, Ms. Riggs. – Thank you, Your Honors. Judge Higginbotham, I wanted to point your attention to the case we cited, Baker v. Regional High School District out of the Second Circuit. I think the court there had some language that may be of assistance in this disenfranchisement versus dilution question, and the Second Circuit there said, we have school districts in which those towns which are paying the most for the district's support have to accept a diluted vote in the running of the schools. Salyer and Toltec, which was the case decided with Salyer, are simply not relevant, and those districts needed to be organized to reflect one-person, one-vote principles. With respect, and I think that goes to the discussion of Lockport, of Republican form of government and the importance of ensuring that when you are electing representatives from districts, and so not exercising direct democracy like voters were in voting on the one-shot referendum in Lockport, that you ensure that the ability of voters to ensure that the bodies elected from the districts fairly reflect the voters who vote, not the regional interests, not the land itself, that one-person, one-vote and in an open-franchise popular election case speaks to the voters voting, not the interests, the regional interests. What's your take on the idea that the legislature has not created an administrative agency with wide rule-making power, et cetera, et cetera, but this is an administering agency that administers the rules that have already been laid pretty much in place? I think that this is a legal question regarding statutory interpretation, and we may characterize differently what the EAA has the authority to do versus what it actually does, but if you look at the statutory language and the rules promulgated by the EAA under their statutory authority, they have more than just this nominal administrative authority. I mean, for example, in section 711.334 of the EAA rules that talks about the transfer of purpose of use, the EAA has the authority to consider whether the proposed change in purpose of use is for a beneficial use. That's a pretty loose reason. Let me ask in the 23 years or whatever it is, has there been litigation over that? Has there been court actions that the EAA has not properly applied that? I mean, it's one thing to say that particular language is there, but has it amounted to anything in the operation of this authority? I'm not aware. I'm not saying that answers the problem, but it does affect the problem. I think, I'm not aware, but the Cunningham case, I think, is instructive, that we cited is instructive on that front, which is... Is that a Texas case? No, it's out of the state of Washington. The question is... The reality is that this is operated pretty much within the constraints of the law. This hasn't been a problem. Well, and there's... Probably looking for a solution. There is changing realities too. Bexar County is getting more and more populated, so the gross population disparity is getting worse and worse. You are seeing increased transfers, sale of water rights, severability and sale of water rights. And so I don't think you're bound by there wasn't an original problem. And to the... I didn't say there wasn't an original problem. Quite the contrary. It is a question of a local resource. Shoshone Mining, you remember a lot of cases in con law, where the local mining rules were followed, et cetera, et cetera. It was the case then. It is increasingly the case now that the voters who are paying the most for the administration of the EAA have the least say in that. And that dilution of the vote in an open franchise system is constitutionally problematic. I do just want to take my last 30 seconds to point out the conflation... One of the most glaring legal errors committed below that I think has sort of been woven into our discussion here today is the district court's conflation of the second prong under Salyer-Ball, so identifying a discrete group that bears the benefits and burdens with rational basis tests, generally speaking. So the Texas legislature's decision to have these balancing of interests isn't part of the inquiry about whether there's a discrete identifiable group that bears both the benefits and the burdens. That group does not exist here. And so the district court should not have even properly gotten to that question about whether it survives, whether there was other rational... Rational basis only comes about if you get past the existence of the preconditions. And since there isn't a discrete group here, LULAC respectfully asks this court to apply the important constitutional provisions at issue here and to reverse the court below. Thank you, Your Honors. Thank you, Ms. Riggs. Your case and both of today's cases are under submission, and the court is in recess under the usual order.